# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

FRANK D. VALLI,

Plaintiff,

v.

ALEJANDRO N. MAYORKAS,
Secretary of the Department of Homeland
Security,

Defendant.

Case No.:  3:21-cv-01390-RBM-BGS

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT**

**[Doc. 24]**

On August 3, 2021, Plaintiff Frank D. Valli ("Plaintiff") filed his Complaint for "Civil Rights—Employment Discrimination and Retaliation."  (Doc. 1, Complaint ("Compl.").)  In his Complaint, Plaintiff alleges two causes of action for discrimination and retaliation under the American Disabilities Act ("ADA").  (Compl. ¶¶ 45–53.)

On June 9, 2023, Defendant Alejandro N. Mayorkas, Secretary of the United States Department of Homeland Security ("Defendant"), filed his Motion for Summary Judgment ("Motion").  (Doc. 24.)  On July 24, 2023, Plaintiff filed his Opposition to Defendant's Motion ("Opposition").  (Doc. 25.)  It includes a Motion for Leave to Amend his Complaint.  (*Id.* at 18–20).  On August 7, 2023, Defendant filed his Reply in Support of his Motion ("Reply").  (Doc. 27.)

1

The Court finds this matter suitable for determination without oral argument pursuant to Civil Local Rule 7.1(d)(1).  For the reasons set forth below, the Court **GRANTS** Defendant's Motion and **DENIES** Plaintiff's Motion for Leave to Amend.

# I.  BACKGROUND

## A.  Factual Background

### 1.  Plaintiff's Employment History

Plaintiff is a Supervisory Marine Interdiction Agent ("SMIA") assigned to the San Diego Air and Marine Branch of the Air and Marine Operations ("AMO") of the United States Customs and Border Protection ("CBP").  (Doc. 28, Joint Statement of Undisputed and Disputed Facts ("Joint Statement") ¶¶ 1–5.)  Plaintiff has been in this supervisor role since October 2011.  (*Id.* ¶ 6.)

As a SMIA, Plaintiff's duties include supervising Marine Interdiction Unit personnel in the performance of interdictory and marine law enforcement support activities, such as apprehending persons engaged in the smuggling of aliens, narcotics, and other illegal contraband by watercraft, vessels, and vehicles.  (*Id.* ¶ 7; Doc. 24, Ex. 13, p. 335.)[1]  It also requires Plaintiff to carry a firearm.[2]  (Doc. 24, Ex. 13, p. 336.)

When Plaintiff started as a SMIA, his immediate supervisor was Director of Marine Operations ("MO") Jeremy Thompson.  (Joint Statement ¶ 8.)  Thompson reported to the AMO Director Hunter Davis.  (*Id.*)  Timothy Sutherland, Director of Air Operations ("AO"), then replaced Davis as AMO Director.  (Doc. 24, Ex. 11, Declaration of Timothy Sutherland ("Sutherland Decl.") ¶¶ 1–2; Ex. 9, Declaration of Christopher Hunter ("Hunter Decl.") ¶ 5.)  In September 2018, Christopher Hunter, Plaintiff's peer, was promoted from SMIA to Assistant MO Director and became Plaintiff's immediate supervisor.  (Joint

---

[1] The Court cites to the court-generated CM/ECF pagination of the document unless otherwise noted.

[2] Plaintiff's attempt to dispute this fact (*see* Joint Statement ¶ 68) is not persuasive.  While Plaintiff was able to continue working "light" or "modified" duty without a firearm, the record is clear that full duty requires Plaintiff to carry a firearm.  (Doc. 24, Ex. 13, p. 335.)

Statement ¶¶ 9–10.)  Thompson then became Plaintiff's second-in-line supervisor.  (*Id.* ¶ 10.)

Effective June 10, 2019, Plaintiff was reassigned from the Marine Unit to the Air Unit located at North Island, which is a secure facility.  (*Id.* ¶ 12.)  After being reassigned to the Air Unit, Plaintiff initially reported to AO Director Sutherland.  (*Id.* ¶ 15.)  However, when Sutherland was promoted to AMO Director, David Stavish replaced Sutherland as AO Director and became Plaintiff's supervisor.  (*Id.*)[3]

In March 2021, Plaintiff transferred back to the Marine Unit, where he currently works as a SMIA.  (*Id.* ¶ 16.)  None of Plaintiff's former supervisors, including Hunter, Thompson, Sutherland, and Davis, are currently within Plaintiff's chain of command.  (*Id.* ¶ 18.)

Throughout the time period relevant to Plaintiff's claims, Plaintiff's SMIA position, job title, and pay grade remained the same.  (*Id.* ¶ 19; Doc. 24, Ex. 1, Deposition of Frank D. Valli ("Pl. Depo.") 298:24–299:8.)

### 2.    Plaintiff's Workplace Injury

On March 1, 2016, Plaintiff injured his right shoulder, resulting in the diagnoses of a right shoulder acromioclavicular joint strain and right shoulder rotator cuff tear.  (Joint Statement ¶ 20.)  After Plaintiff's injury, Plaintiff was placed off work on temporary total disability ("TTD").  (*Id.* ¶ 21.)  CBP then granted Plaintiff's request for a leave of absence.  (*Id.*)

On May 19, 2016, Plaintiff was released to modified duty with restrictions, including no firearm or gun belt, no law enforcement apprehensions, no combative training, and no

---

[3] In addition to Plaintiff, 19 employees within the San Diego Air and Marine Unit were reassigned duty locations between September 2017 and July 2020.  (Joint Statement ¶ 13.) Of the 19 employees who were reassigned duty locations or had supervisor functions removed between September 2017 and July 2020, at least six were GS-13 employees (like Plaintiff), but none had known disabilities and only one had engaged in prior Equal Employment Opportunity ("EEO") activity.  (*Id.* ¶ 14.)

vessel crew or driving.  (*Id.* ¶ 22.)  CBP placed Plaintiff in a limited duty assignment that allowed him to perform supervisory administrative duties that complied with his medical restrictions.  (*Id.* ¶ 24.)

While on light duty, on November 25, 2016, Plaintiff was in an altercation with a drunk driver, during which he re-injured his shoulder.  (Doc. 25, Ex. 1, Pl. Depo. 83:10–85:13; Joint Statement ¶ 25.)  After this incident, Plaintiff requested to work in plain clothes to avoid being identified as law enforcement and put at risk of further injury.  (Doc. 24, Ex. 1, Pl. Depo. 89:16–91:12; Doc. 24, Ex. 10, Thompson Decl. ¶¶ 10, 23; Doc. 25-2, Ex. 1, Pl. Depo. 118:17–119:1; Doc. 25, Ex. 7, Thompson Depo. 18:13–19:1.)  Thompson granted Plaintiff's request.  (Doc. 24, Ex. 1, Pl. Depo. 89:16–91:12; Joint Statement ¶ 72.)  Plaintiff was initially only supposed to wear plain clothes for 90 days, but he ultimately wore plain clothes for more than two years.  (Joint Statement ¶ 72.)  Before the altercation on November 25, 2016, Plaintiff wore his law enforcement uniform for approximately six months following his return to work in May 2016 after his initial injury.  (Joint Statement ¶ 26.)

On May 10, 2017, Plaintiff underwent a right shoulder arthroscopic procedure, which was performed by Dr. Michael Lenihan.  (*Id.* ¶ 27.)  Following his surgery, Plaintiff was placed off work on TTD and then CBP granted Plaintiff's request for a leave of absence.  (*Id.* ¶ 28.)

On June 26, 2017, Plaintiff was released to modified duty with restrictions, including no repetitive pushing or pulling with the right upper extremity, no work at shoulder level or above, no lifting greater than five pounds, no field work, sedentary desk work only, and no firearms.  (*Id.* ¶ 29.)  For the next approximately two years, Plaintiff's physician continued to place him on modified duty with various restrictions.  (*Id.* ¶ 30.)  During these two years, CBP placed Plaintiff in a limited duty assignment that allowed him to perform supervisory administrative duties that complied with his medical restrictions.  (*Id.* ¶ 31.)

### 3.    Air and Marine Operation's Uniform Policy and Plaintiff's Requested Accommodation/Waiver

AMO's Uniform Handbook and Wear Policy ("Uniform Policy") requires all employees to be in official CBP uniform while on duty unless the requirement is waived by the appropriate Director.  (*Id.* ¶ 32.)  AMO has a "Class 4 Administrative Support and Enforcement Polo Uniform" designed specifically for non-law enforcement agents or personnel on limited or light duty.  (*Id.* ¶ 34.)  The administrative uniform includes a white or black, short or long sleeve administrative or enforcement polo shirt.  (*Id.* ¶ 35.)  AMO operations personnel do not have the authority to conduct their duties in plain clothes.  (*Id.* ¶ 36.)

In late 2018, the Executive Assistant Commissioner of AMO addressed all directors regarding the expectation for workforce appearance.  (*Id.* ¶ 37.)  On February 7, 2019, AMO Director Davis sent an email to MO Director Thompson and AO Deputy Director Sutherland emphasizing the need to comply with the organization's uniform and grooming requirements.  (*Id.* ¶ 39.)  In response to the February 7, 2019 email from Davis, Thompson ordered that all personnel be in uniform.  (*Id.* ¶ 40.)  This order applied equally to all employees, including at least three San Diego Marine Unit employees on light duty assignments.  (*Id.* ¶ 41.)  All "light duty" employees in the Marine Unit complied with the order except for Plaintiff.  (Doc. 24, Ex. 10, Thompson Decl. ¶¶ 10, 23; Doc. 24, Ex. 9, Hunter Decl. ¶ 33.)[4]

On February 15, 2019, Assistant MO Director Hunter instructed Plaintiff to begin wearing the non-enforcement, administrative uniform.  (*Id.* ¶ 42.)  In his February 15, 2019 email to Plaintiff, Hunter stated that he had reviewed Plaintiff's medical documentation

---

[4] Plaintiff's attempt to dispute this fact (*see* Joint Statement ¶ 73) is not persuasive.  Plaintiff concedes that he did not wear a uniform until June 29, 2019.  (Doc. 24, Ex. 1, Pl. Depo. 215:11–17.)

and "did not find any restrictions on wearing a non-enforcement uniform."  (*Id.* ¶ 74.)[5] Hunter also stated that the administrative uniform would "not identify [Plaintiff] as a law enforcement officer and does not require duty gear or a gun belt."  (*Id.* ¶ 43.)

On February 26, 2019, Assistant MO Director Hunter learned that Plaintiff was not wearing his uniform, so he approached Plaintiff regarding the matter.  (*Id.* ¶ 45.)  Plaintiff informed Hunter that he had a doctor's note, dated February 20, 2019, with the restriction of "plain clothes only, no uniform."  (*Id.* ¶ 46.)  The doctor's note was the first time Dr. Lenihan had included a uniform restriction for Plaintiff.  (*Id.* ¶ 47.)  In response, Hunter screamed at Plaintiff "Oh, no.  You work for me" or something to that effect.  (Doc. 25-2, Ex. 1, Pl. Depo. 242:9–243:3.)  Hunter also asked Plaintiff "what [are you] trying to do, get a medical retirement out of this?" or something to that effect.  (*Id.* at 244:11–14.)  Hunter then stated, "we're going to go nine rounds.  We're going to go nine rounds, and you're going to lose."  (*Id.* at 244:20–22.)  Hunter asked Plaintiff to write a memorandum as to why he was not in uniform, but Plaintiff refused.  (*Id.* at 243:4–14, 245:5–12.)  Likewise, on March 5, 2019, MO Director Thompson ordered Plaintiff to put in writing accusations that he made against Assistant MO Director Hunter during a previous meeting by March 6, 2019, but Plaintiff said he needed more time.  (Doc. 24, Ex. 10, Thompson Decl. ¶ 40.)  Thompson then said he needed the facts by March 11, 2019, but Plaintiff did not comply.  (*Id.*)

Despite this conflict, Plaintiff was permitted to continue wearing plain clothes to work until management could get clarification from Plaintiff's doctor on the "plain clothes only" restriction.  (Joint Statement ¶ 49.)  Notably, Dr. Linehan testified that the "plain clothes only" requirement was a "prophylactic restriction" because Plaintiff had reported that he had been in an altercation while in uniform and did not want to be identified as law

---

[5] Plaintiff contends that this statement is misleading (*see* Joint Statement ¶ 74), but the Court is not persuaded.  This is an accurate summary of Hunter's letter.  (Doc. 24, Ex. 28, p. 493.)

enforcement.  (*Id.* ¶ 76.)  Dr. Linehan also testified that there was no reason Plaintiff could not put on the non-enforcement, administrative uniform with Plaintiff's range of motion at the time he was given the "plain clothes only" restriction.  (*Id.* ¶¶ 48, 76.)

On April 3, 2019, MO Director Thompson again ordered Plaintiff to write, complete, and turn in a memorandum regarding Plaintiff's complaints against Assistant MO Director Hunter.  (*Id.* ¶ 98; Doc. 24, Ex. 10, Thompson Decl. ¶ 40.)  Thompson gave Plaintiff until April 4, 2019 to turn in the memorandum.  (Doc. 24, Ex. 10, Thompson Decl. ¶ 40.) Thompson did not know that April 4, 2019 was Plaintiff's day off.  (*Id.* ¶ 41.)  Plaintiff did not submit the memorandum until April 11, 2019.  (*Id.* ¶¶ 40–41.)

On May 22, 2019, Plaintiff emailed an EEO Counselor requesting an accommodation for the uniform requirement, but on June 12, 2019, Plaintiff confirmed that he did not wish to pursue this accommodation request.  (Joint Statement ¶ 50.)

### 4.     Plaintiff's Transfer to the North Island Air Unit

On or around February 28, 2019, MO Director Thompson told Plaintiff he had been on light duty too long, threatened Plaintiff with a Fitness for Duty Examination, and told Plaintiff that he would be reassigning Plaintiff to the Air Branch.  (Doc. 25-2, Ex. 8, p. 143.)  Around the same time, Plaintiff learned that Thompson and Assistant MO Director Hunter directed Mission Support Specialist Melissa Walkup to initiate a search for light duty positions within San Diego and to contact Plaintiff's nurse case manager concerning his medical information in an effort to move Plaintiff into another position.  (*Id.* at 143– 144.)   On March 21, 2019, AO Director Sutherland discussed with Thompson the possibility of moving Plaintiff from the Marine Unit to the Air Unit on North Island.  (Doc. 24, Ex. 33, p. 509.)

On May 2, 2019, Plaintiff made his initial contact with an EEO Counselor regarding his complaints of disability discrimination and retaliation.  (Joint Statement ¶ 61.)  On May 31, 2019, Stephanie Kopchak, Labor and Employee Relations Specialist for CBP, wrote to Davis:

I consulted with EEO Specialist Ahmad Zadah. He is aware of the PDO

7

referral from complainant Frank Valli against Deputy Director Thompson and Associate Director Hunter. I explained the agency's position that it would be a hardship to the agency to move both the Deputy and the Associate from the branch, given that would remove your two highest ranking management officials from marine operations. I explained that it would be more operationally feasible to move the complainant. He understands how crippling the movement of the managers could be to operations. He recommends offering Mr. Valli the opportunity to go to North Island or to go to one of the air locations. He said that if Mr. Valli doesn't agree to move, management should allow him to stay at his current location.

(Doc. 24, Ex. 36, p. 522.) Shortly thereafter, on June 7, 2019, AMO Director Davis notified Plaintiff that he was being transferred to North Island:

[I]n light of recent allegations within the Marine Unit, I'm redirecting your work assignment to North Island effective Monday June 10th. … This should neutralize any concerns of a hostile work environment or harassment and provide a comfortable environment for you to work. We will provide a Silver Ford Fusion GOV which can be used to transit between the Marine Unit and North Island during work hours.

(Doc. 25-2, Ex. 5, p. 112.)

MO Director Thompson stated that, during the three years since Plaintiff was injured, AMO's needs evolved significantly and that it was critical to have a fully capable and operational SMIA on the night shift. (Doc. 24, Ex. 10, Thompson Decl. ¶¶ 10, 27, 34.) Specifically, he contends that transnational criminal organizations were exploiting the maritime arrival zones at higher rates than ever before and that the San Diego Air and Marine Branch was facing migrant surges, increased media attention, and a deteriorating relationship with U.S. Border Patrol. (*Id.* ¶ 10.) For this reason, the Marine Unit needed a SMIA on the night shift who was capable of performing necessary law enforcement support capabilities in the field, which Plaintiff could not because of his medical restrictions and refusal to wear a uniform.[6] (*Id.*) Thompson also contends that he offered

---

[6] Plaintiff disputes that he was unable to perform the SMIA night shift (Joint Statement ¶¶ 77–78); however, Plaintiff's dispute is not persuasive. The evidence shows that had

8

Plaintiff the position at the North Island branch because it was located in a secure facility where Plaintiff could perform his duties without fear of being identified as law enforcement and attacked.  (*Id.* ¶ 27.)

### 5.    Plaintiff's Light Duty Offer

On June 27, 2019, shortly after Plaintiff had transferred to North Island, AO Director Sutherland met with Plaintiff to offer him a new temporary light duty assignment that complied with his medical restrictions.  (Joint Statement ¶ 51.)  The offer indicated that the SMIA position, while modified, was still uniformed and that Plaintiff would be expected to wear the non-enforcement, administrative uniform, which "consists of a non-enforcement polo shirt with the Air and Marine Logo (no badge or other markings) and tan pants."  (*Id.* ¶ 52.)

Sutherland met with Plaintiff again on June 29, 2019 and informed him that the conditions of the offer would not change.  (*Id.* ¶ 54.)  Plaintiff then asked again to have the uniform requirement waived.  (*Id.* ¶ 55.)  In response, Sutherland explained that the Workers' Compensation Specialist had given clear guidance to proceed with a light duty offer that did not have any exemptions regarding clothing or the administrative logo.  (*Id.* ¶ 56.)

Plaintiff refused to sign the light duty agreement, stating it was not accurate because it did not align with his doctor's note regarding his uniform.  (*Id.* ¶ 57.)  AO Director Sutherland advised Plaintiff that he could not work light duty without signing the offer letter and that Plaintiff's only other options would be to use his earned leave or take leave without pay status.  (*Id.* ¶ 58.)  Plaintiff took sick leave until approximately August 24, 2019.[7]  (Doc. 24, Ex. 24, p. 438.)

---

medical restrictions that interfered with his ability to perform the SMIA role, including apprehending persons and carrying a weapon.  (Joint Statement ¶¶ 22, 29–31.)

[7] There is a genuine dispute as to whether Plaintiff chose to take sick leave or was forced to take sick leave (*see* Joint Statement ¶ 75); however, as discussed below, this "disputed

On July 24, 2019, Plaintiff filed his formal EEO Complaint.  (*Id.* ¶ 62.)

### 6.     Plaintiff Returns to Full Duty

On August 19, 2019, Dr. Lenihan released Plaintiff to return to full duty with no restrictions, and Plaintiff returned to work on August 24, 2019.  (*Id.* ¶ 59.)

## B.   Procedural Background

### 1.     Plaintiff's Complaint

On August 3, 2021, Plaintiff filed the instant lawsuit, alleging two causes of action for discrimination and retaliation in violation of the ADA.  (Compl. ¶¶ 45–53.)  In his Complaint, Plaintiff alleges that he "has been subject to constant harassment, discrimination, hostile work environment, and retaliation[,]" that "CBP supervisors and management level employees have discriminated against Plaintiff in the terms, conditions, and privileges of his employment on a regular basis[,]" and that "DHS supervisors and management level employees repeatedly undermined Plaintiff's ability to conduct his job duties competently" since his injury.  (Compl. ¶¶ 14, 17.)  Plaintiff then alleges numerous specific acts of harassment, discrimination, and retaliation.  (Compl. ¶¶ 18–44.)

### 2.     Defendant's Motion for Summary Judgment

In Defendant's Motion, Defendant first argues that the federal government is not subject to suit under the ADA and, therefore, that both claims must be dismissed with prejudice.  (Doc. 24 at 16–17.)  Even had Plaintiff brought his claims under the Rehabilitation Act, Defendant argues Plaintiff failed to timely exhaust his administrative remedies because Plaintiff did not contact an EEO counselor within 45 days of many of the allegedly discriminatory and retaliatory acts.  (*Id.* at 17–19.)

Defendant then argues that Plaintiff cannot establish the elements required to prove a disability discrimination claim.  Specifically, Defendant argues that Plaintiff is not a "qualified individual" protected by the Rehabilitation Act because, at the time of the

---

fact" is not material to the Court's analysis because Plaintiff's request for accommodation was not reasonable.

alleged discriminatory acts, Plaintiff could not perform the essential functions of his position with or without reasonable accommodation. (*Id.* at 20–21.) Likewise, Defendant argues that Plaintiff was not treated less favorably than similarly situated, non-disabled employees (*id.* at 21–22); that CBP had legitimate, non-discriminatory reasons for its actions; and that Plaintiff cannot establish pretext (*id.* at 22–30).

Lastly, Defendant argues that Plaintiff cannot establish a *prima facie* case of Retaliation because there is no causal link between Plaintiff's protected activity (e.g., the filing of Plaintiff's EEO claim) and the allegedly adverse employment acts (*id.* at 31–32) and because Defendant had legitimate, non-retaliatory reasons for all his actions. (*Id.* at 32.)

### 3.  Plaintiff's Opposition to Defendant's Motion for Summary Judgment

In his Opposition, Plaintiff recites many of the claims and allegations set forth in his Complaint and in his written discovery responses. (Doc. 25 at 8–11.) Specifically, Plaintiff accuses Defendant of the following discriminatory and retaliatory acts:

a.  On October 6, 2017, Hunter attached a decal of a scrotum and penis to Plaintiff's vehicle, photographed it, then sent the photo to Plaintiff via email attachment, and later made a homosexual reference to Plaintiff and laughed at him.

b.  From the year 2018 through 2019, on almost every morning, Hunter would turn the office lights off despite Plaintiff requesting to keep the lights on.

c.  On January 30, 2018, Hunter ordered Plaintiff to give him Plaintiff's service weapon to wear because Hunter left his at his residence and was expecting a visit from the Under Secretary.

d.  On or around March 3, 2018, Hunter yelled and used foul language at Plaintiff in front of his subordinates in an attempt to undermine him.

e.  On March 7, 2018, Hunter and Thompson initially told Plaintiff, due to his injury, he would not be attending Firearms Instructor Recertification Training Program (FIRTP).

f.  On March 27, 2018, while working in a light duty capacity, Thompson

threatened to send Plaintiff for a Fitness for Duty Examination.

g. On March 27, 2018, when Plaintiff was consulting with a locksmith, Hunter approached Plaintiff and told him, "Get the fuck back upstairs to the meeting."

h. On September 24, 2018, Hunter approached Plaintiff about a schedule change that was not reflected on the schedule, berated Plaintiff, and told Plaintiff it was his (Plaintiff's) job to update the schedule.

i. On February 26, 2019, Hunter ordered Plaintiff to start wearing his uniform, despite Plaintiff having a doctor's note to work in plain clothes, called him a "malingerer," threatened him with punitive action, and told Plaintiff, "We will go nine rounds, and you will lose."

j. On February 26, 2019, Hunter asked Plaintiff, "What are you trying to do, get a medical retirement?" then Thompson ordered Plaintiff to write a memorandum as to why he was not in uniform, and again threatened Plaintiff with a Fitness for Duty Examination.

k. On or around February 28, 2019, Thompson told Plaintiff that he would be reassigning Plaintiff to the Air Branch to work as an Air Command Duty Officer or in the Operations Department; told Plaintiff he had been on light duty going on three years and was going to have to "take some action;" and, once again threatened Plaintiff with a Fitness for Duty Examination.

l. On or around February 28, 2019, Plaintiff learned that Davis and Thompson directed Mission Support Specialist Melissa Walkup to initiate a search for light duty positions within the San Diego Area of Responsibility (AOR) and to contact Plaintiff's nurse case manager concerning his medical information in an effort to move Plaintiff into another position.

m. On or around February 28, 2019, Thompson delayed in issuing Plaintiff his fifteen (15) year Federal Service Certificate, which was a year late.

n. On April 3, 2019, Thompson ordered Plaintiff to write, complete, and turn in a memorandum on Plaintiff's scheduled day off.

o. On June 7, 2019, Complainant was assigned to NASNI effective June 10, 2019, and had his supervisory duties removed.

p. On June 12, 2019, Plaintiff learned from his subordinates that during a going

away party, Thompson attempted to start a physical altercation with one of Plaintiff's subordinate employees and slandered Plaintiff saying, "Frank Valli fucked me."

q. On June 17, 2019, Complainant learned his Fiscal Year (FY) 2019 mid-year performance review was not completed by Hunter and Thompson because he was not issued an FY 19 performance plan.

r. On June 29, 2019, after Plaintiff refused to sign [a] light duty agreement that did not comply with his medical restrictions, Davis and Sutherland required Plaintiff to take sick leave until Plaintiff signed the light duty agreement or returned to full duty.

(*Id.*)   In support of these allegations, Plaintiff cites various excerpts from his deposition testimony and his interrogatory responses.  (*Id.*)

Plaintiff then argues that his claims are not time-barred because all his claims and allegations, even those arising more than 45 days before Plaintiff first contacted an EEO counselor, were accepted for review by the EEOC in accordance with the EEOC Regulation in 29 CFR Part 1614.  (*Id.* at 13–14.)  Plaintiff does not cite any specific provision of the EEOC Regulations or any other law or authority supporting his position.  (*Id.*)

Plaintiff also argues that his discrimination claims are triable because he is a "qualified individual" who, with or without accommodation, can perform the essential job functions of the SMIA position and because Defendant failed to provide him "reasonable accommodation" related to his disability.  (*Id.* at 15–16.)

Plaintiff argues that his retaliation claim is triable because transferring him to the North Island Air Unit, effective June 10, 2019, was an "act of retaliation."  (Doc. 25 at 7, 17.)  Specifically, Plaintiff argues that he engaged in a protected activity when he filed his EEO complaint and that, as a result, he was reassigned to the North Island Air Unit, a less desirable location.  (*Id.* at 17.)

1    Finally, acknowledging that his claims should have been brought under the
2    Rehabilitation Act, not the ADA, Plaintiff requests leave to amend his Complaint. (Doc.
3    25 at 18–20.)

4                        ## II.    LEGAL STANDARD

5    Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil
6    Procedure if the moving party demonstrates there is no genuine issue of material fact and
7    that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v.*
8    *Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing
9    substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*,
10   477 U.S. 242, 248 (1986); *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.,*
11   *Inc.*, 618 F.3d 1025, 1031 (9th Cir. 2010). "A genuine issue of material fact exists when
12   the evidence is such that a reasonable jury could return a verdict for the nonmoving
13   party." *Fortune Dynamic*, 618 F.3d at 1031 (internal quotation marks and citations
14   omitted). "Disputes over irrelevant or unnecessary facts will not preclude a grant of
15   summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626,
16   630 (9th Cir. 1987).

17   The party seeking summary judgment "bears the initial responsibility of informing
18   the district court of the basis for its motion." *Celotex*, 477 U.S. at 323. To carry its burden,
19   "the moving party must either produce evidence negating an essential element of the
20   nonmoving party's claim or defense or show that the nonmoving party does not have
21   enough evidence of an essential element to carry its ultimate burden of persuasion at
22   trial." *Jones v. Williams*, 791 F.3d 1023, 1030–31 (9th Cir. 2015) (quoting *Nissan Fire &*
23   *Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000)).

24   Once the moving party establishes the absence of a genuine issue of material fact,
25   the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided
26   in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *T.W. Elec. Serv.*,
27   809 F.2d at 630 (citations omitted). The nonmoving party "may not rest upon the mere

28

allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (citation omitted).

When ruling on a summary judgment motion, the court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255. In ruling on a motion for summary judgment, the Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III.   DISCUSSION

## A.   The Federal Government is Not Subject to Suit Under the ADA

Title I of the ADA provides, "[n]o *covered entity* shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (emphasis added). The ADA then defines "covered entity" as "an *employer*, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2) (emphasis added). The ADA then defines "employer" as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person…." 42 U.S.C. § 12111(5)(A).

However, the term "employer" excludes "the United States, a corporation wholly owned by the government of the United States, or an Indian tribe…." 42 U.S.C. § 12111(5)(B)(i). Thus, "[i]t is well-settled that the federal government is excluded from the ADA's definition of 'employer'" and "the ADA provides no remedy to federal employees." *Jackson v. Napolitano*, No. CV-09-1822-PHX-LOA, 2010 WL 94110, at *3 (D. Ariz. Jan. 5, 2010) (internal quotation marks and citations omitted); *see also Channel v. Wilke*, No.

15

2:18-cv-02414 MCE AC (PS), 2019 WL 1491646, at *4 (E.D. Cal. Apr. 4, 2019), *report and recommendation adopted*, No. 2:18-cv-02414 MCE AC (PS), 2019 WL 2448423 (E.D. Cal. June 12, 2019) (dismissing ADA claims with prejudice). Instead, "[t]he Rehabilitation Act, 29 U.S.C. § 791, et seq., not the ADA, is the exclusive remedy for claims of disability discrimination in federal employment." *Ibanez v. Donahue*, No. EDCV 14-00462-VAP (SPx), 2014 WL 12967593, at *2 (C.D. Cal. Oct. 28, 2014) (citation omitted); *see also Calero-Cerezo v. U.S. Dep't of Just.*, 355 F.3d 6, 19 (1st Cir. 2004) ("The [Rehabilitation Act], the precursor to the ADA, applies to federal agencies, contractors and recipients of federal financial assistance, while the ADA applies to private employers with over 15 employees and state and local governments.").

Here, Plaintiff brings two causes of action under the ADA—one for discrimination and one for retaliation. (Compl. ¶¶ 45–53.) However, as stated above, the ADA is not the proper avenue for disability discrimination and retaliation claims against federal employers, like the Department of Homeland Security. On this basis alone, the Court dismisses Plaintiff's claims with prejudice.[8] *See Channel*, 2019 WL 1491646, at *4.

Plaintiff is correct, however, that "'[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the [Rehabilitation Act],' and courts routinely look to [Rehabilitation Act] case law to interpret the rights and obligations created by the ADA." *Washington v. Serrato*, Case No. 22-cv-05832 BLF (PR), 2023 WL 2671384, at *2 (N.D. Cal. Mar. 28, 2023) (quoting *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999)) (citing *Collings v. Longview Fibre Co.*, 63 F.3d 828, 832 n.3 (9th Cir. 1995)). Nevertheless, even construing Plaintiff's claims as brought under

---

[8] Acknowledging that his claims should have been brought under the Rehabilitation Act and not the ADA, Plaintiff requests leave to amend his Complaint. (Doc. 25 at 18–20.) However, as discussed in detail below, Plaintiff's Rehabilitation Act claims would also fail. Thus, granting Plaintiff leave to amend would be futile.

the Rehabilitation Act, there is no genuine dispute of material fact warranting this case to proceed to trial.  The Court conducts this analysis below.

**B.    Plaintiff's Claims Pre-Dating March 18, 2019 are Time-Barred**

"No qualified individual with a disability shall, on the basis of that disability, be subjected to discrimination in employment under any program or activity conducted by the Department [of Homeland Security]. The definitions, requirements and procedures of section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791), *as established by the Equal Employment Opportunity Commission in 29 CFR part 1614*, shall apply…."  6 C.F.R. § 15.40 (emphasis added).  Pursuant to 29 CFR part 1614, "[a]ggrieved persons who believe they have been discriminated against on the basis of … disability … must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter.  *An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.*"  29 C.F.R. § 1614.105(a)(1).

In accordance with these regulations, the Ninth Circuit has held that "[t]o preserve [his or] her right to maintain a suit alleging employment discrimination against an agency of the United States, a claimant must exhaust [his or] her administrative remedies by filing a claim of discrimination with the allegedly offending agency in accordance with published procedures."  *Leorna v. U.S. Dep't of State*, 105 F.3d 548, 550–52 (9th Cir. 1997) (internal citations omitted).  "[A] claimant must consult the allegedly discriminating agency's EEO counselor prior to filing a complaint in order to try to informally resolve the matter ('pre-complaint processing') [and] [t]he claimant must initiate this contact with the counselor within forty-five days of the date of the alleged discriminatory act."  *Id.* (internal citations omitted) (failure to timely contact EEO counselor resulted in failure to preserve right to maintain a suit alleging employment discrimination against the State Department); *see also Thompson v. Donahoe*, 961 F. Supp. 2d 1017, 1026 (N.D. Cal. 2013) ("A plaintiff must initiate contact with an EEO counselor within 45 days of the harassing conduct.  The counselor must inform a plaintiff of the right to file a formal EEO claim no later than 30

days after being contacted.  A plaintiff has 15 days from receipt of this notice to file a formal claim with the EEO office.  For an EEO claim to be properly exhausted, therefore, the conduct at issue must have occurred no earlier than 90 days prior to the filing of a formal EEO claim.") (internal citations omitted).

"Failure to comply with this regulation is 'fatal to a federal employee's discrimination claim.'"  *Cherosky v. Henderson*, 330 F.3d 1243, 1245 (9th Cir. 2003) (quoting *Lyons v. England*, 307 F.3d 1092, 1105 (9th Cir. 2002) (""Although it does not carry the full weight of statutory authority, failure to comply with this regulation has been held to be fatal to a federal employee's discrimination claim.") (internal quotations and citations omitted)).

"The timeliness requirement for the purposes of exhaustion of discrimination claims further depends on whether the claim is based on discrete acts or a single discriminatory employment practice. *Discrete discriminatory acts are not actionable if time barred*, even when they are related to acts alleged in timely filed charges. Thus, each discrete discriminatory act starts a new clock for filing charges alleging that act." *Blackman-Baham v. Kelly*, Case No. 16-cv-03487-JCS, 2017 WL 679514, at *13–14 (N.D. Cal. Feb. 21, 2017) (internal quotations and citations omitted) (claims based on conduct occurring more than 45 days before initial EEO counselor contact are time-barred); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) ("[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'").

Here, it is undisputed that Plaintiff first contacted an EEO counselor on May 2, 2019. (*See* Joint Statement ¶ 61.)  For this reason, Defendant argues that Plaintiff's claims regarding discriminatory and/or retaliatory acts occurring before March 18, 2019—45 days before May 2, 2019—are time-barred.  Plaintiff seemingly disregards Defendant's argument and very briefly responds that his claims, even those arising more than 45 days before Plaintiff first contacted an EEO counselor, are timely because they were accepted

for review by the EEOC.  (Doc. 25 at 13–14.)  However, the Court agrees with Defendant that claims based on conduct occurring more than 45 days before the initial EEO counselor contact are time-barred.  *Blackman-Baham*, 2017 WL 679514 at *13–14.  Thus, the only remaining allegations set forth in Plaintiff's Opposition are the following:

    a.  From the year 2018 through 2019, on almost every morning, Hunter would turn the office lights off despite Plaintiff requesting to keep the lights on.

    b.  On April 3, 2019, Thompson ordered Plaintiff to write, complete, and turn in a memorandum on Plaintiff's scheduled day off.

    c.  On June 7, 2019, Complainant was assigned to NASNI effective June 10, 2019, and had his supervisory duties removed.

    d.  On June 12, 2019, Plaintiff learned from his subordinates that during a going away party, Thompson attempted to start a physical altercation with one of Plaintiff's subordinate employees and slandered Plaintiff saying, "Frank Valli fucked me."

    e.  On June 17, 2019, Complainant learned his Fiscal Year (FY) 2019 mid-year performance review was not completed by Hunter and Thompson because he was not issued an FY 19 performance plan.

    f.  On June 29, 2019, after Plaintiff refused to sign a light duty agreement that did not comply with his medical restrictions, Davis and Sutherland required Plaintiff to take sick leave until Plaintiff signed the light duty agreement or returned to full duty.

(Doc. 25 at 8–11.)  The Court now addresses the merits of each of these remaining claims.

## C.   Disability Discrimination (First Cause of Action)

"Rehabilitation Act § 504 forbids organizations that receive federal funding, …, from discriminating against people with disabilities."  *Mark H. v. Hamamoto*, 620 F.3d 1090, 1097 (9th Cir. 2010) (citing 29 U.S.C. § 794; *Mark H. v. Lemahieu*, 513 F.3d 922, 929 (9th Cir. 2008); *Bird v. Lewis & Clark Coll.*, 303 F.3d 1015, 1020 (9th Cir.2002)).  Specifically, the Rehabilitation Act states, *"[n]o otherwise qualified individual with a disability in the United States*, as defined in section 705(20) of this title, shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits

of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency….” 29 U.S.C. § 794(a) (emphasis added).  The Rehabilitation Act broadly defines “program or activity” to include “all of the operations of... an entire corporation, partnership, or other private organization, or an entire sole proprietorship” if the entity as a whole receives federal assistance or if the entity “is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation,” and various other services.  29 U.S.C. § 794(b)(3)(A).

Interpreting the Rehabilitation Act, the Ninth Circuit has decided that “[s]ection 504 creates a private right of action for individuals subjected to disability discrimination by any program or activity receiving federal financial assistance, *including employment discrimination in such programs*.”  *Fleming v. Yuma Reg’l Med. Ctr.*, 587 F.3d 938, 940 (9th Cir. 2009) (citations omitted) (emphasis added).  Further, Section 504(d) provides that “[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act ... as such sections relate to employment.”  29 U.S.C. § 794(d).  Therefore, to establish a *prima facie* case of discrimination under the Rehabilitation Act or the ADA Plaintiff must also show that he is disabled, qualified, and suffered an *adverse employment action* solely because of his disability.  *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001) (citing *Sanders v. Arneson Prods., Inc.*, 91 F.3d 1351, 1353 (9th Cir.1996); 29 U.S.C. § 794(a)) (emphasis added).

Here, the Parties do not dispute that Plaintiff has a disability—his shoulder injury.  (Doc. 24 at 20.)  Therefore, the pertinent questions are (1) whether Plaintiff is a “qualified individual” and (2) whether Plaintiff suffered an adverse employment action based “solely” on his disability.  *See* 29 U.S.C. § 794(a); *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001); *Cefalu v. Holder*, No. C12-0303 TEH, 2013 WL 5315079, at *7 (N.D. Cal. Sept. 23, 2013), on reconsideration in part, No. C12-0303 TEH, 2013 WL 6671799 (N.D. Cal. Dec. 18, 2013).  “A failure to provide reasonable accommodation can

20

constitute discrimination under section 504 of the Rehabilitation Act." *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) (citing 28 C.F.R. § 35.130(b)(7)).

As set forth below, the Court finds that Plaintiff is not a qualified individual and did not suffer an adverse employment action based solely on his disability.

### 1.   Plaintiff is Not a Qualified Individual

Under the ADA and, therefore, the Rehabilitation Act, a "qualified individual" is an individual with a disability "who, with or without reasonable accommodation, can perform the essential functions of [the] position." 29 C.F.R. § 1630.2(m). "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. 1630.2(n)(1). "The term 'essential functions' does not include the marginal functions of the position." *Id.*

Further, the individual must be "'qualified' at the time of the alleged discrimination." *Johnson v. Bd. of Trustees of Boundary Cnty. Sch. Dist. No. 101*, 666 F.3d 561, 564 (9th Cir. 2011) (citing *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1112 (9th Cir. 2000)). "If a disabled person cannot perform a job's 'essential functions' (even with a reasonable accommodation), then the ADA's employment protections do not apply." *Cripe v. City of San Jose*, 261 F.3d 877, 884–85 (9th Cir. 2001). An employer is not required "to exempt an employee from performing essential functions or to reallocate essential functions to other employees." *Dark v. Curry Cnty.*, 451 F.3d 1078, 1089 (9th Cir. 2006).

Plaintiff argues that he performed the essential functions of his SMIA position from the time of his injury to approximately June 2019 and received "glowing performance reviews." (Doc. 25 at 15.) However, Plaintiff's performance while on modified or light duty is not the relevant inquiry. CBP was not required to exempt him from performing the essential functions of a full-duty SMIA or to reallocate those essential functions to another employee. *Dark*, 451 F.3d at 1089. The relevant inquiry is whether Plaintiff could perform the duties of a full-duty SMIA. He could not.

21

It is undisputed that Plaintiff was on modified or limited duty from the time of his injury on March 1, 2016 until approximately August 19, 2019 (*See* Joint Statement ¶¶ 20, 22–24, 28–31), the entire time frame of the alleged discrimination.  It is also undisputed that a full-duty SMIA's duties include law enforcement support activities, such as apprehending persons and carrying a firearm, and that Plaintiff was released to modified duty with restrictions, including no law enforcement apprehensions, no firearms, and "sedentary desk work only." (*See* Joint Statement ¶¶ 7, 22, 29.)  Thus, it is apparent that Plaintiff could not perform all the essential functions of a full-duty SMIA and, therefore, is not a "qualified individual" under the Rehabilitation Act.  *See Puletasi v. Wills*, 290 F. App'x 14, 17 (9th Cir. 2008) (special agent that cannot carry a firearm or handle dangerous persons is not a "qualified individual"), cert. denied, 555 U.S. 1056 (2008); *Cefalu v. Holder*, 2013 WL 5315079, at *8–10 (plaintiff not a "qualified individual" under the Rehabilitation Act where elbow injury prevented him from lifting a firearm, an essential function of his position as an ATF Special Agent).

The *Puletasi* case is particularly informative.  The *Puletasi* plaintiff, a Special Agent for the Bureau of Customs, Immigration and Enforcement ("ICE"), developed "Guillain-Barre" syndrome, which resulted in paralysis and weakness that was projected to last for a year or more.  *Sam Puletasi v. Wills*, No. CV 05-00291 HG-KSC, 2006 WL 8451351, at *1 (D. Haw. Nov. 21, 2006).  The *Puletasi* defendant held the plaintiff's job open for over a year, but when the plaintiff returned to work, he was in a wheelchair, had little hand/grip strength, and could not take the firearm test.  *Id.*  For this reason, the plaintiff's duties were reduced to light desk work.  *Id.*  The *Puletasi* defendant then discontinued the plaintiff's overtime pay and failed to give him a grade increase.  *Id.*  Approximately two to three years after becoming ill, the *Puletasi* plaintiff was still unable to perform the physical duties of a special agent, and his employment was terminated.  *Id.*  The district court held that the *Puletasi* plaintiff was not "qualified" for his Special Agent position because he could not take his firearm recertification test and, therefore, was unable to perform the "essential functions" of the Special Agent job.  *Sam Puletasi*, 2006 WL 8451351, at *5.  The Ninth

22

Circuit Court of Appeals agreed, noting that the plaintiff was not cleared to carry a firearm and could not run, jump, or climb, all essential functions of the Special Agent position. *Puletasi*, 290 F. App'x at 17.

This case is similar to the *Puletasi* case.  As in *Puletasi*, Plaintiff is not a qualified individual because at the time of the allegedly discriminatory acts, Plaintiff was unable to perform the "essential functions" or the SMIA role, such as apprehending persons or carrying a firearm.  (Joint Statement ¶¶ 29–30.)  Even so, Defendant allowed plaintiff to continued working as an SMIA on light, administrative duty for years until Plaintiff was able to resume his full duty SMIA position.  (*Id.* ¶ 31.)  On this basis alone, Plaintiff's discrimination claim fails.  Nevertheless, the Court address the remaining elements of a disability discrimination claim below.

### 2. Plaintiff Was Not Discriminated Against Solely by Reason of His Disability

Whether Plaintiff was discriminated against solely based on his disability is analyzed under the same burden-shifting analysis applied to Title VII claims and set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1175–76 (9th Cir. 1998).  "Under this scheme, if the employer disclaims any reliance on the employee's disability in having taken the employment action, *McDonnell Douglas* Title VII disparate impact analysis should be used to determine if the employer's reason is pretextual.  On the other hand, if the employer acknowledges reliance on the disability in the employment decision, the employer bears the burden of showing that the disability is relevant to the job's requirements."  *Id.* at 1175–76 (internal citations omitted).

Here, the evidence is clear that Defendant accommodated Plaintiff's disability for approximately three years and that Plaintiff's request to wear "plain clothes" was not reasonable.  Further, Defendant has set forth numerous legitimate, non-discriminatory reasons for the allegedly adverse employment actions and, regardless, has demonstrated that Plaintiff's disability is relevant to the SMIA job requirements.

23

### a)      Defendant Accommodated Plaintiff's Disability for Three Years

Plaintiff cannot prove that he was discriminated against based solely on his disability.  There is no genuine dispute that Defendant accommodated Plaintiff's disability in accordance with his medical restrictions for approximately three years.  For instance, it is undisputed that Defendant granted Plaintiff's two requests for paid medical leave.  (Joint Statement ¶¶ 21, 28.)  It is also undisputed that Defendant allowed Plaintiff to work limited or modified duty from the time of his injury on March 1, 2016 until approximately July of 2019.  (Joint Statement ¶¶ 20, 23–24, 28–30.)  Finally, it is undisputed that Defendant also allowed Plaintiff to wear "plain clothes" for approximately two and a half years.  (Joint Statement ¶¶ 72, 79.)  Plaintiff cannot establish a claim for disability discrimination when Defendant granted Plaintiff's requests for medical leave and accommodated Plaintiff's disability medical restrictions for several years.

### b)      Plaintiff's Request to Wear "Plain Clothes" Was Not a Reasonable Accommodation

As stated above, "[a] failure to provide reasonable accommodation can constitute discrimination under section 504 of the Rehabilitation Act."  *Vinson*, 288 F.3d at 1154.  "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).

However, "[r]easonable accommodation does not require an organization to make fundamental or substantial alterations to its programs."  *Mark H.*, 620 F.3d at 1098.  For example, "[a]n 'employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation.'"  *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) (citation omitted).

"An accommodation is reasonable if it is reasonable on its face."  *Mark H.*, 620 F.3d at 1098 (internal quotation omitted).  "The question whether a particular accommodation

24

is reasonable 'depends on the individual circumstances of each case' and 'requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards.'"  *Vinson*, 288 F.3d at 1154 (quoting *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999)).

"[W]hen a handicapped person is not able to perform the essential functions of the job, the employer, and later the court, must also consider whether any 'reasonable accommodation' by the employer would enable the handicapped person to perform those functions." *Am. Fed'n of Gov't Emps., Loc. 51 v. Baker*, 677 F. Supp. 636, 638 (N.D. Cal. 1987) (citations omitted). "It is the word 'accommodation,' not the word 'reasonable,' that conveys the need for effectiveness." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002).

A plaintiff bears the initial burden of producing evidence that a reasonable accommodation was possible, but thereafter, the burden shifts to the defendant to produce rebuttal evidence that the requested accommodation was not reasonable. *Vinson*, 288 F.3d at 1154 (quoting *Wong*, 192 F.3d at 818).

Here, the evidence demonstrates that Plaintiff's request to wear plain clothes after February 2019 was not reasonable.  First, although not outcome determinative, it is noteworthy that Plaintiff did not formally request an accommodation.  Rather, it is undisputed that "[o]n May 22, 2019, Plaintiff emailed an EEO Counselor requesting an accommodation for the uniform requirement, but on June 12, 2019, Plaintiff confirmed that he did not wish to pursue this accommodation request."  (Joint Statement ¶ 50.)

Second, although Plaintiff now contends that he experienced pain when putting on pullover shirts (*see* Plaintiff's Responses to Joint Statement ¶¶ 71, 102), the evidence does not support Plaintiff's contention.  Rather, the evidence shows that Plaintiff requested to wear plain clothes out of fear of being identified as law enforcement after an altercation with a drunk driver that exacerbated his shoulder injury.  (*See* Doc. 25-2, Ex. 1, Pl. Depo. 83:10–85:13, 118:17–119:1, 156:8–157:8; Doc. 25-2, Ex. 7, Thompson Depo. 18:13–19:1; Doc. 24, Ex. 1, Pl. Depo. 89:16–91:12; Doc. 24, Ex. 10, Thompson Decl. ¶¶ 10, 23; Joint

Statement ¶¶ 25–26.)  In fact, Dr. Linehan stated at his deposition that the "plain clothes only" requirement was a "prophylactic restriction" because Plaintiff had been in an altercation while in uniform and did not want to be identified as law enforcement.  (*See* Joint Statement ¶ 76.)  Dr. Linehan also stated that there was no reason Plaintiff could not put on the non-enforcement, administrative polo shirt with his range of motion at the time he was given the "plain clothes only" restriction.  (*See id.* ¶¶ 48, 76.)  Not wanting to be identified as law enforcement when Plaintiff is a law enforcement officer is unreasonable on its face, and Plaintiff's disability discrimination claim fails on this basis.  *See Mark H.*, 620 F.3d at 1098.

Third, Plaintiff's reason for requesting a "plain clothes" accommodation is not based on his injury but rather his fear of being identified as law enforcement and therefore being at risk of further injury.  At least one Circuit Court of Appeals has determined that fear of future injury is not a reasonable basis for accommodation.  *See Hale v. Harrison Cnty. Bd. of Supervisors*, 8 F.4th 399, 404 n.† (5th Cir. 2021) (finding ADA claim based on fear of future harm to the plaintiff's liver "frivolous").  The Court agrees.

Fourth, Plaintiff's concern about being identified as law enforcement, attacked, and re-injured was alleviated when Defendant permitted Plaintiff to wear the non-law enforcement, administrative polo uniform and transferred to the secure facility at North Island. It is undisputed that the AMO has an "Administrative Support and Enforcement Polo Uniform" designed specifically for non-law enforcement agents and that, on February 15, 2019, Hunter instructed Plaintiff to begin wearing this non-enforcement, administrative uniform.  (Joint Statement ¶¶ 31–36, 42–43.)  Likewise, it is undisputed that, on June 27, 2019, Sutherland offered Plaintiff a new temporary light duty assignment requiring Plaintiff to wear the non-enforcement, administrative polo.  (*Id.* ¶¶ 52–53.)  Lastly, it is undisputed that Plaintiff was reassigned to the Air Unit located at North Island, which is a secured facility.  (*Id.* ¶ 12.)  Thus, there is no genuine dispute that Plaintiff's concern about being identified as law enforcement, attacked, and re-injured was addressed.

Finally, Plaintiff's request to wear "plain clothes" is not a reasonable accommodation that would allow him to fully perform his SMIA duties. Even if permitted to wear plain clothes, Plaintiff still required a modified or light duty assignment due to his medical restrictions. Therefore, the "reasonable accommodation" requested by Plaintiff did not allow him to perform the essential functions of his SMIA position. *See Am. Fed'n of Gov't Emps., Loc. 51*, 677 F. Supp. at 638. Therefore, Plaintiff has not met his burden of proving his request for accommodation was reasonable. *See Vinson*, 288 F.3d at 1154 (quoting *Wong*, 192 F.3d at 818).

### (1) Defendant Had Legitimate, Non-Discriminatory Reasons for Its Actions, and Plaintiff Cannot Prove Pretext

As explained above, Plaintiff's Opposition only presents six remaining factual allegations. (*See supra* Section III.B.) In his Motion, Defendant argues that he had a legitimate, non-discriminatory reasons for each of these actions and that Plaintiff cannot establish pretext. (*See* Doc. 24 at 22–30.) Notably, Plaintiff does not address *any* of these arguments in his Opposition. (*See* Doc. 25 at 14–16.) Plaintiff also does not argue that Defendant's actions were pretext. (*Id.*)

Even assuming Plaintiff argued that Defendant's actions were pretext, which he did not, Plaintiff could not establish that Defendant's actions were pretext. First, the following allegations are not related to Plaintiff's disability or request for reasonable accommodation, did not result in any allegedly adverse employment action, and, therefore, cannot support a claim for disability discrimination:

- From the year 2018 through 2019, on almost every morning, Hunter would turn the office lights off despite Plaintiff requesting to keep the lights on.

- On June 12, 2019, Plaintiff learned from his subordinates that during a going away party, Thompson attempted to start a physical altercation with one of Plaintiff's subordinate employees and slandered Plaintiff saying, "Frank Valli fucked me."

- On June 17, 2019, Complainant learned his Fiscal Year (FY) 2019 mid-year performance review was not completed by Hunter and Thompson because he was not issued an FY 19 performance plan.

Plaintiff's only remaining claims involve Plaintiff's request for reasonable accommodation not to wear his uniform, Defendant's request that Plaintiff draft a memorandum explaining why he would not wear his uniform, Defendant's decision to reassign Plaintiff to the Air Unit, and Defendant's refusal to make Plaintiff a light duty offer exempting him from the uniform requirement.  (*See supra* Section III.B.)

As explained in detail above (*see supra* Section III.C.2.b), Plaintiff's request to wear "plain clothes" was not reasonable.  Therefore, Defendant's request that Plaintiff draft a memorandum explaining why he would not wear his uniform and Defendant's refusal to make Plaintiff a light duty offer exempting him from the uniform requirement cannot support a claim for disability discrimination.  Further, Plaintiff does not contend that Defendant's decision to reassign Plaintiff to the Air Unit was based on his disability.  Rather, Plaintiff contends that Defendant's decision to reassign Plaintiff to the Air Unit was made in retaliation for the filing of Plaintiff's EEO complaint.  (Doc. 25 at 12.) Therefore, the Court addresses this retaliation claim below.  (*See infra* III.D.)

## D. Retaliation (Second Cause of Action)

"Because the ADA was modeled on section 504 of the Rehabilitation Act, 'courts have applied the same analysis to claims brought under both statutes.'"  *Boose v. Tri-County Metro. Transp. Dist. of Oregon*, 587 F.3d 997, 1001 n.5 (9th Cir. 2009) (quoting *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999)); *see also Douglas v. Cal. Dep't of Youth Auth.*, 285 F.3d 1226, 1229 n.3 (9th Cir. 2002) (noting that cases interpreting the ADA and the Rehabilitation Act are "interchangeable").

"[T]he legal elements and the production of proof for a retaliation claim under the Rehabilitation Act is the same as that used under the ADA, namely, that in the absence of direct evidence of retaliation, a plaintiff may rely on the burden-shifting framework used for proving discrimination claims under Title VII as articulated in *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792, 802–04 [] (1973).”  *Brooks v. Capistrano Unified Sch. Dist.*, 1 F. Supp. 3d 1029, 1035–36 (C.D. Cal. 2014) (citation omitted).  “Under the *McDonnell Douglas* burden-shifting framework, the plaintiff must first establish a prima facie case of retaliation.  Then the burden shifts to the defendant to set forth a legitimate, non-retaliatory reason for the actions taken.  If the defendant does so, the plaintiff must then show that the defendant's proffered reason is a pretext for retaliation.”  *Id.* (citation omitted).

“To establish a prima facie case of retaliation under the Rehabilitation Act, 'the employee must establish that: (1) he or she engaged in a protected activity; (2) suffered an adverse employment action; and (3) there was a causal link between the two.'”  *Aki v. Univ. of Cal. Lawrence Berkeley Nat'l Lab'y*, 74 F. Supp. 3d 1163, 1180 (N.D. Cal. 2014) (quoting *Pardi v. Kaiser Found. Hosp., Inc.*, 389 F.3d 840, 849 (9th Cir.2004)) (citing (citing *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir.2000)).

Here, there is no genuine dispute that Plaintiff engaged in a protected activity—the filing of his EEO Complaint.  Instead, Defendant argues that there is no causal link between the protected activity and the allegedly adverse employment action—the reassignment of Plaintiff to the Air Unit.  (Doc. 24 at 31–32.)[9]  For the reasons set forth below, the Court finds that there is a genuine issue of material fact as to whether there is a causal link between Plaintiff's EEO complaint and his reassignment to the Air Unit.  However, the Court's analysis does not end there.  Defendant has set forth legitimate, non-discriminatory reasons for his actions, and Plaintiff cannot establish pretext.  Thus, Plaintiff's retaliation claim fails.

---

[9] While Defendant notes in his moving brief that Plaintiff's pay, job title, and status within the organization stayed the same after his transfer to the Air Unit (*see* Doc. 24 at 27), Defendant does not explicitly address the second element—whether Plaintiff suffered an "adverse employment action."  Accordingly, the Court assumes *for the purposes of this Motion only* that Plaintiff's reassignment constituted an "adverse employment action."

29

**1.      There is a Genuine Dispute of Material Fact as to Whether There Is a Causal Link Between Plaintiff's EEO Complaint and His Reassignment**

"Courts have generally held that causation can be inferred from timing alone where the adverse action follows closely on the heels of the protected activity." *Lee v. Natomas Unified Sch. Dist.*, 93 F. Supp. 3d 1160, 1169 (E.D. Cal. 2015).  In other words, "[w]hen an adverse action closely follows a complaint, retaliatory intent may be inferred." *Id.* (citation omitted).  Here, it is undisputed that (1) Plaintiff first contacted an EEO counselor on May 2, 2019, (2) CBP's Labor and Employee Relations department became aware of Plaintiff's EEO complaint on May 31, 2019, and (3) Plaintiff was transferred to the Air Unit effective June 10, 2019.  (*See* Joint Statement ¶¶ 61, 65, 82, 99.)  The Court could infer causation from this close timing alone.

Timing aside, there is still a genuine dispute of material facts as to whether Plaintiff was transferred to the Air Unit because of his EEO complaint.  The record shows that Sutherland and Thompson discussed the possibility of moving Plaintiff from the Marine Unit to the Air Unit as early as March 21, 2019, before Plaintiff filed his EEO complaint. (*See* Doc. 24, Ex. 33, p. 509.)  However, the record also shows that, on May 31, 2019, CBP's Labor and Employee Relations Specialist recommended offering Plaintiff the opportunity to move to the North Island Air Unit due to Plaintiff's complaints against management within the Marine Unit (*see* Joint Statement ¶ 81; Doc. 24, Ex. 36, p. 522) and that, shortly thereafter, Davis wrote to Plaintiff, "in light of recent allegations within the Marine Unit, I'm redirecting your work assignment to North Island effective June 10, 2019." (Joint Statement ¶ 108.)   Thus, there is a genuine dispute of material fact as to whether there is a causal connection between Plaintiff's EEO complaint and his transfer to the North Island Air Unit.

**2.      Defendant Had Legitimate, Non-Discriminatory Reasons for Its Actions, and Plaintiff Cannot Prove Pretext**

Having found a genuine dispute of material fact concerning a causal link between Plaintiff's EEO complaint and his transfer to the Air Unit, "the burden shifts to [Defendant]

to set forth a legitimate, non-retaliatory reason for the actions taken." *Brooks*, 1 F. Supp. 3d at 1035–36. "If [Defendant] does so, the plaintiff must then show that [Defendant's] proffered reason is a pretext for retaliation." *Id.*

To meet his burden, Defendant proffers several legitimate and non-retaliatory reasons for reassigning Plaintiff to the North Island Air Unit. First, the evidence shows that Defendant contemplated transferring Plaintiff to the Air Unit *before* Plaintiff contacted an EEO counselor. (Doc. 24, Ex. 33, p. 509; Doc. 25-2, Ex. 8, p. 143–144.) Plaintiff himself contends in his verified written discovery responses that, on or around February 28, 2019, Thompson told Plaintiff that he would be reassigning Plaintiff to the Air Branch and a Mission Support Specialist initiated a search for light duty positions within San Diego in an effort to move Plaintiff into another position. (Doc. 25-2, Ex. 8, p. 143–144.) Further, on March 21, 2019, Sutherland discussed with Thompson the possibility of moving Plaintiff from the Marine Unit to the Air Unit on North Island. (Doc. 24, Ex. 33, p. 509.)

Second, Thompson stated, and Defendant argues, that, during the three years since Plaintiff was injured, AMO's needs evolved significantly and that it was critical to have a fully capable and operational SMIA on the night shift. (*See* Doc. 24, Ex. 10, Thompson Decl. ¶¶ 10, 27, 34.) Specifically, Thompson stated that transnational criminal organizations were exploiting the maritime arrival zones at higher rates than ever before and that the San Diego Air and Marine Branch was facing migrant surges, increased media attention, and a deteriorating relationship with U.S. Border Patrol. (*Id.* ¶ 10.) For this reason, the Marine Unit needed a SMIA on the night shift who was capable of performing necessary law enforcement support capabilities in the field, which Plaintiff could not because of his medical restrictions and refusal to wear a uniform. (*Id.*) Plaintiff has not presented any evidence that Thompson's statements regarding AMO's needs are not true. Rather, Plaintiff contends that he was capable of performing all the night-shift job functions. The Court is not persuaded. As discussed above, Plaintiff had medical restrictions that interfered with his ability to perform the SMIA role, including apprehending persons and carrying a weapon. (*See* Joint Statement ¶¶ 22, 29–31.)

31

Third, it is undisputed that other non-disabled individuals were also reassigned during the relevant time period. In fact, 19 employees within the San Diego Air and Marine Unit were reassigned duty locations between September 2017 and July 2020. (Joint Statement ¶ 13.) Of the 19 employees who were reassigned duty locations and/or had supervisor functions removed between September 2017 and July 2020, at least six were GS-13 employees (like Plaintiff), but none of whom had known disabilities and only one of whom had engaged in prior Equal Employment Opportunity ("EEO") activity. (*Id.* ¶ 14.)

Fourth, Thompson also contends that he offered Plaintiff the position at the North Island branch because it was located in a secure facility where Plaintiff could perform his duties without fear of being attacked. (Doc. 24, Ex. 10, Thompson Decl. ¶ 27.) Thompson contends that this alleviated Plaintiff's concern about wearing a uniform, being identified as law enforcement, and being attacked. (*Id.*) Plaintiff does not dispute that the Air Unit located at North Island is a secure facility. (*See* Joint Statement ¶ 12.) Plaintiff also cannot dispute that one of the stated reasons for his transfer was to provide him with a "comfortable work environment[.]" (Doc. 24, Ex. 55, p. 601.) Plaintiff, therefore, cannot establish that this proffered reason was pretext.

Fifth, the evidence shows that Plaintiff's transfer was not retaliatory but an attempt to satisfy Plaintiff's desire not to be within Hunter and Thompson's chain of command. It is undisputed that on May 31, 2019, CPB's Labor and Employee Relations Specialist wrote to Davis informing him of the EEO specialist's recommendation:

> "[EEO Specialist Ahmad Zadah] is aware of the PDO referral from complainant Frank Valli against Deputy Director Thompson and Associate Director Hunter. I explained the agency's position that it would be a hardship to the agency to move…[the] two highest ranking management officials from marine operations. … He recommends offering Mr. Valli the opportunity to go to North Island or to go to one of the air locations."

(Joint Statement ¶ 81; Doc. 24, Ex. 36, p. 522.)

32

Finally, the evidence shows that Plaintiff was free to decline the transfer.  CPB's Labor and Employee Relations Specialist wrote, "[EEO Specialist Ahmad Zadah] recommends offering Mr. Valli the opportunity to go to North Island or to go to one of the air locations. He said that if Mr. Valli doesn't agree to move, management should allow him to stay at his current location." (Joint Statement ¶ 81; Doc. 24, Ex. 36, p. 522.)  While Plaintiff contends in his Opposition that "the transfer was not posed to Plaintiff as optional" (Doc. 25 at 12), Plaintiff has not presented any evidence that he attempted to decline the reassignment and was refused.  Plaintiff cannot claim that his transfer was retaliatory when he was free to decline.

## IV.   **CONCLUSION**

Based on the foregoing, the Court **GRANTS** Defendant's Motion for Summary Judgment and **DENIES** Plaintiff's Motion for Leave to Amend.

**IT IS SO ORDERED.**

DATE:  December 15, 2023

HON. RUTH BERMUDEZ MONTENEGRO
UNITED STATES DISTRICT JUDGE